BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General, Tax Litigation Branch

LANDON M. YOST (CABN 267847)
Trial Attorney, United States Department of Justice
Civil Division, Tax Litigation Branch
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-2144; Fax: (202) 307-0054
E-mail: Landon.M.Yost@usdoj.gov; Western.Taxcivil@usdoj.gov

Of Counsel:
BART M. DAVIS
United States Attorney, District of Idaho
*Counsel for the United States of America*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF IDAHO

| | |
|---|---|
| POCATELLO COMMUNITY CHARTER SCHOOL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 4:26-cv-00095-DCN<br><br>**UNITED STATES' ANSWER AND COUNTERCLAIM** |
| UNITED STATES OF AMERICA,<br><br>Counterclaim Plaintiff,<br><br>v.<br>POCATELLO COMMUNITY CHARTER SCHOOL, INC.,<br><br>Counterclaim Defendant. | |

## PARTIES

1. Plaintiff, the Pocatello Community Charter School, is a school-of-choice based on a charter, serving students from kindergarten through the eighth grade.

**ANSWER:** Admits.

2. Plaintiff's principal place of business is located at 995 South Arthur Avenue, Pocatello, Idaho 83204.

**ANSWER:** Admits.

3. Defendant is the United States of America.

**ANSWER:** Admits.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(1).

**ANSWER:** Denies.

5. Plaintiff brings this action under I.R.C. § 7422 to recover refunds of overpaid federal employment taxes, plus interest, for the tax quarters ended June 30, 2020, September 30, 2020, December 31, 2020, and September 30, 2021 ("quarters at issue").

**ANSWER:** Admits that Plaintiff is bringing this action under this section, but denies that it is properly brought.

6. Specifically, on or about July 28, 2022, Plaintiff filed Forms 941-X, Adjusted Employer's Quarterly Federal Tax Return on Claim for Refund, seeking recovery of employment tax for the quarters at issue.

**ANSWER:** Admits.

7. By Notices CP210 dated October 24, 2022, the IRS allowed the employment tax refund for the quarters at issue.

**ANSWER:** The United States admits that the IRS issued the requested refunds for the quarters at issue on or around this date.

8. Subsequently, by Notices CP220 dated June 5, 2023, the IRS notified Plaintiff that it assessed employment taxes in the amount that Plaintiff claimed, and the IRS had previously allowed, for the quarters at issue.

**ANSWER:** The United States admits that such notices were issued for the quarters at issue, but denies that they were all issued on June 5, 2023.

9. On or about April 18, 2025, Plaintiff filed Forms 843 with the IRS submitting the full payment of amount of the assessed employment taxes for one employee for each of the quarters issue. At the same time, Plaintiff claimed refunds in the same amount of the employment taxes that it paid.

**ANSWER:** The United States admits that such forms were filed claiming refunds in those amounts, but otherwise denies for lack of knowledge.

10. Plaintiff herein seeks a refund of employment taxes that are divisible within the meaning of governing federal law, and, prior to filing this action, Plaintiff fully paid a divisible portion of the tax assessment at issue and timely filed claims for refund with the Internal Revenue Service pursuant to 26 U.S.C. § 7422(a). See Treas. Reg. § 31.3111-6 (allegedly erroneous ERC credits are treated as underpayments of employment taxes); 26 U.S.C. 6331(i)(2) ("divisible taxes" include any tax imposed by Subtitle C of the Internal Revenue Code, which encompasses employment taxes); *Boynton v. United States*, 566 F.2d 50, 52 (9th Cir. 1977)

(citing *Steele v. United States*, 280 F.2d 89 (8th Cir. 1960)); *Korobkin v. United States*, 988 F.2d 975, 976 (9th Cir. 1993).

**ANSWER:** The United States admits that Plaintiff seeks a refund of divisible employment taxes and that a divisible portion of the tax assessments at issue were paid, but denies that proper claims for refund were timely filed with the IRS.

11. The action is proper under I.R.C. § 6532(a)(1), as more than six months have passed since Plaintiff filed its claims for refund with the IRS.

**ANSWER:** The United States admits that more than six months have passed since Plaintiff filed the Forms 843 with the IRS, and that the action under Section 6532(a)(1) would thus be proper if those Forms 843 were proper claims for refund, which the United States denies.

12. The IRS has not paid Plaintiff for the claimed refunds.

**ANSWER:** Admits.

13. Venue in this Court is proper under 28 U.S.C. § 1402 because Plaintiff maintains its principal place of business in this District.

**ANSWER:** Admits.

## NATURE OF ACTION

14. Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney's fees), authorized to be paid to the Plaintiff under § 2301 of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act (Pub. L. No. 116-136, 134 Stat. 281 (2020)) (as

amended by § 207(d)(1)(A) of the Taxpayer Certainty and Disaster Relief Act of 2020 ("Relief Act") (Pub L. No. 116-260, 134 Stat. 1182 (2020)) and I.R.C. § 3134.[1]

**ANSWER:** Admits that this action is brought under I.R.C. § 7422, but denies that the credit was authorized to be paid.

## BACKGROUND

### A. The Employee Retention Credit

15. Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted the United States' local and national economies.

**ANSWER:** Admits.

16. Those orders formed a latticework of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID-19.

**ANSWER:** Admits, but avers that regulations varied nationwide and were not always consistent across jurisdictions.

17. The governmental response to that public health emergency involved historically unprecedented measures, including lockdown orders, social distancing mandates, and forced

[1] The current version of I.R.C. § 3134 became effective for calendar quarters beginning after September 30, 2020, and, as relevant here, is identical to the version of I.R.C. § 3134 that was in effect during the quarters at issue. For ease of reference, this Complaint references I.R.C. § 3134 when discussing the 2021 ERC requirements.

**ANSWER:** Admits.

business closures.

**ANSWER:** Admits.

18. The economic effects of those policies were profound and the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion. Alvin Powell, *What might COVID cost the U.S.? Try $ 16 trillion*, THE HARVARD GAZETTE, Nov. 10, 2020, https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16trillion/.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

19. In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the Employee Retention Credit ("ERC").

**ANSWER:** Admits.

20. The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the unprecedented challenges posed by the pandemic.

**ANSWER:** Admits.

21. Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy.

**ANSWER:** Admits.

22. The credit is available to eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

**ANSWER:** Admits that the credit was generally available for these quarters for eligible employers with qualified wages who otherwise met the statutory and procedural requirements for the credit.

**B. Threshold Requirement: Carrying on a Trade or Business**

23. An employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue. I.R.C. § 3134(c)(2).

**ANSWER:** Admits that this is one requirement to claim an ERC, but not the only requirement.

**C. Suspension of Business Operations**

24. An employer is eligible for the ERC if the employer's "operation of the trade or business . . . is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)." I.R.C.§ 3134(c)(2)(A)(ii)(I).

**ANSWER:** Admits that this is one requirement to claim an ERC, but not the only requirement.

25. The CARES Act does not require that a government order directly regulate the partially suspended business. See generally I.R.C. § 3134. The language in CARES Act § 2301(c)(2)(A)(ii)(I) and I.R.C. § 3134(c)(2)(A)(ii)(I) contemplates businesses that were constructively suspended through the widespread effects of lockdown orders and similar mandates.

**ANSWER:** Denies.

26. Guidance published in the Internal Revenue Bulletin provides a safe harbor that a business is partially suspended if "more than a nominal portion of its business operations are suspended by a governmental order." *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act*, Notice 2021-20, 2021-11 I.R.B. 922, 928 ("Notice 2021-20").[2]

**ANSWER:** Admits that the language from Notice 2021-20 is quoted correctly, but denies the remaining allegations.

**D. Qualified Wages**

27. Under I.R.C. § 3134(a), an "eligible employer" is "allowed a credit against applicable employment taxes for each calendar quarter equal to" a percentage of the "q*ualified wages*" paid with "respect to *each employee* of such employer for such calendar quarter[s]."

**ANSWER:** Admits but avers that the statutory language differs slightly from that purportedly quoted above.

28. Under I.R.C. § 3134(c)(3) and (c)(4), "qualified wages" include "wages" as defined by I.R.C. § 3121(a) and certain "health plan expenses."

---

[2] To the extent that Notice 2021-20 purports to restrict ERC eligibility, it is not controlling law because the notice was not promulgated through the notice-and-comment procedures prescribed in the Administrative Procedures Act, 5 U.S.C. § 553. Further, to the extent that Notice 2021-20 is more restrictive than the relevant statutes concerning ERC eligibility, it is not controlling law because parties may always assail an administrative pronouncement as exceeding the agency's statutory authority in proceedings against them. *See NLRB Union v. Fed. Lab. Rels. Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987).

**ANSWER:** Admit that the notice was not promulgated through notice-and-comment procedures, denies the remaining allegations. Avers that the notice is interpretive, not legislative, and therefore notice-and-comment was not required. *See Stenson Tamaddon LLC v. United States Internal Revenue Serv.*, No. CV-24-01123-PHX-SPL, 2025 WL 1725942 (D. Ariz. June 20, 2025).

**ANSWER:** Admits, but avers that the statutory definition contains additional details and exceptions not set forth above.

29. In 2021, eligible employers are allowed a credit against applicable employment taxes for each calendar quarter that is equal to 70 percent of qualified wages paid with respect to each employee of such an employer for such calendar quarter.

**ANSWER:** Admits that this is what I.R.C. § 3134(a) provides in general, but avers that other requirements must also be met.

30. Under I.R.C. § 3134(b), the maximum amount of qualified wages per employee an employer may take into account for any calendar quarter in 2021 is $10,000.

**ANSWER:** Admits.

31. In other words, the maximum credit amount an employer may claim per employee for each calendar quarter in 2021 is $7,000.

**ANSWER:** Admits.

## STATEMENT OF FACTS

### A. Plaintiff's Business Operations Prior to COVID-19 Government Orders

32. Plaintiff is a charter school, organized on November 10, 1998, in the state of Idaho and authorized for students in kindergarten through grade eight.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

33. During the relevant time period, Plaintiff operated in one building of approximately 25,800 total square feet located on approximately 4.9 acres of land at 995 South Arthur Street, Pocatello, Idaho 83204 (the "facility").

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

34. The facility contained thirteen classrooms, two conference rooms, one library and media center, one warming kitchen, one teacher preparation area, one computer lab, one multipurpose room, three administrative offices, five offices for support staff, one gymnasium, and a large outdoor playground space.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

35. Prior to the COVID-19 epidemic, Plaintiff's students attended school in person five days a week.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

36. One of Plaintiff's primary goals was to give its students the experience and skills to adapt to, learn from, and initiate change.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

37. To accomplish this, Plaintiff's child-centered curriculum taught thinking abilities and revolved around the children's questions in any given discipline, with a teacher working as a guide.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

38. Plaintiff employed cooperative learning and multiage classrooms to

encourage social flexibility and give students experience in adapting to different social situations.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

39. Plaintiff also employed the Expeditionary Learning ("EL") concept, which provides extraordinary educational opportunities for students giving them opportunities to develop social flexibility, as well as learning that they, personally, can affect their communities.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

40. The EL model involved students participating in "learning expeditions". These were purposeful, extensive studies of a single topic, which harnessed the power of adventure and discovery, and led students to become more motivated in their academic work while developing perseverance and self-discipline.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

41. The EL approach was furthered through a multitude of events and activities including, but not limited to: Speech Festival (an event where all students recite speeches to peers and judges); Passages (a student's oral defense of their work-product portfolio demonstrating mastery of standards necessary to pass on to the next grade level); Fall Festival; Music Festival; Field Day; Expedition Exhibition; and student-led conferences.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

42. As part of the EL model, Plaintiff also maintained an adventure program where, each year, students enjoyed camping, rock climbing and snow-crossing expeditions. In addition to learning through the expeditions themselves, Plaintiff's students also learned by preparing for the expeditions outside of school ("Adventure Program").

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

43. In connection with Plaintiff's responsibility to create an effective learning environment for its students, Plaintiff operated with an awareness that most students learn best in person with a teacher guiding their instruction.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

**B. Relevant Government Orders**

44. Government orders issued in response to the COVID-19 pandemic prevented, restricted, or substantially limited conduct of Plaintiff's activities. Specifically, the government orders that impacted Plaintiff's business operations included, but were not limited to, the following:

**ANSWER:** Denies.

*a. State Orders*

*Orders of the Governor of Idaho and the Idaho Department of Health and Welfare*

45. On March 13, 2020, the governor of Idaho issued a proclamation that a state of emergency ("SOE") due to the "occurrence and imminent threat to public health and safety arising from the effects of the 2019 novel coronavirus (COVID-19)" existed in the State

of Idaho, thereby triggering a heightened duty by employers to provide safe workplaces for their employees. Though superseded by subsequent proclamations, the substance of the SOE continued in effect until at least October 15, 2021.

**ANSWER:** The United States admits that the proclamation was issued on this date, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

46. Effective March 25, 2020, the governor of Idaho ordered the Idaho Department of Health and Welfare ("IDHW") to issue an order for Idaho individuals to "self-isolate" at home ("Order to Self-Isolate").

**ANSWER:** Admits.

47. Charter schools, including Plaintiff, were deemed Essential Businesses and were permitted to continue limited operations to "facilitat[e] distance learning or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible."

**ANSWER:** Admits that the quoted language is contained in the March 25, 2020 Order and that all educational institutions were deemed essential, but denies that the Order used the term "limited operations" in connection with educational institutions.

48. Essential Businesses were also required to comply with the Order's "Social Distancing Requirements" to the greatest extent feasible. These requirements included six-foot social distancing between individuals, heightened and more frequent personal hygiene measures, and regular cleaning of high-touch surfaces.

**ANSWER:** Admits.

49. The Order to Self-Isolate was amended and extended, and it remained in effect until May 1, 2020, when it was officially rescinded by the May 1, 2020, Stay Healthy Order (Stage 1).

**ANSWER:** Admits.

50. In April of 2020, the State of Idaho began to implement "Idaho Rebounds," which was a phased reopening plan for the state ("Reopening Plan").

**ANSWER:** Admits that, on or about April 23, 2020, Governor Brad Little announced plans to help Idaho rebound; the United States is otherwise without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

51. Generally, there were four stages to the Reopening Plan, Stage 1 being the most restrictive and Stage 4 being the least restrictive.

**ANSWER:** Admits.

52. Beginning in the second quarter of 2020, Idaho, like other states, intended to progress through the stages according to the dates originally outlined by the Reopening Plan.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

53. However, as infection and transmission rates increased in the third and fourth quarters of 2020 and into the first quarter of 2021, Idaho, again like other states, regressed into earlier stages.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

54. Orders issued pursuant to the Reopening Plan were jointly issued by the governor of Idaho and IDHW.[3]

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

55. On May 1, 2020, IDHW issued Stay Healthy Order (Stage 1). Under this Order, employers were required to:

a. Implement six-foot social distancing of all individuals, including employees, "whenever possible";

b. "Provide adequate sanitation and personal hygiene" for all individuals on premises, including employees;

c. "Frequently disinfect commonly touched and high-traffic areas and regularly clean those areas";

d. "Identify how personal use items such as masks, face coverings, and gloves may be required by employees, vendors, and/or patrons";

e. Minimize "close interactions with patrons";

f. "Identify strategies for addressing ill employees, which should include requiring COVID-19 positive employees to stay at home while infectious, and may include keeping employees who are directly exposed to the COVID-19 positive employee away from the

[3] For ease of reference, this Complaint identifies the IDHW as the governmental authority issuing the relevant orders.

workplace, and the closure of the business until the location can be properly disinfected";

g. Implement other practices appropriate to the employer's specific type of business, including screening employees for infection or exposure to COVID-19; and

h. Implement other protocols developed pursuant to Idaho Rebounds.

**ANSWER:** Denies. Avers that only (a)-(c) were requirements, whereas the remaining listed activities were merely encouraged.

56. Gatherings of any size, whether "public or private," were to "be avoided."

**ANSWER:** Denies. Avers that the actual terms of the May 1, 2020, Order were "Gatherings, both public and private, **should** be avoided." (emphasis added)

57. Violations of the May 1, 2020, Order were expressly punishable by fine, imprisonment, or both.

**ANSWER:** Admits but avers that only violation "of any mandatory provision" was so punishable.

58. Cities, counties, and public health districts (e.g., Southeastern Idaho Public Health district ("SIPH"), also known as "District 6") were permitted to "enact more stringent public health orders than those set out in the [May 1, 2020] Order."

**ANSWER:** Admits.

59. Effective May 16, 2020, IDHW issued Stay Healthy Order (Stage 3). Under this Order, requirements for employers remained the same as under the May 1, 2020, Order, but added that "[g]atherings" of more than 10 individuals were to "be avoided." Those gatherings that were held were required to, amongst other measures, maintain six-foot social distancing

between individuals "whenever possible," implement heightened personal hygiene measures, and "regularly clean high-touch surfaces." Like the May 1, 2020, Order, violations of the May 16, 2020, Order were expressly punishable by fine, imprisonment, or both. And, like the May 1, 2020, Order, cities, counties, and public health districts were permitted to "enact more stringent public health orders than those set out in this [May 16, 2020] Order."

**ANSWER:** Denies. Avers that on May 16, 2020, IDHW issued a Stage 2 Order that stated "Businesses and governmental agencies may continue to resume operations at physical locations in the State of Idaho" with exceptions identified in the order. Avers that the Order merely said that gatherings of more than 10 individuals **should** be avoided and those participating **should** adhere to certain social distancing and sanitation requirements. Avers that many of those requirements were not mandatory, and only violation "of any mandatory provision" of the Order was punishable by fine, imprisonment, or both. Admits that cities, counties, and public health districts were permitted to enact more stringent orders.

60. Effective May 30, 2020, IDHW issued Stay Healthy Order (Stage 3). Under this Order, requirements for employers remained unchanged from the May 1, 2020, and May 16, 2020, Orders. Gatherings of 50 or more people were to "be avoided," but those gatherings that were held were required with the requirements that remained unchanged from the May 16, 2020, Order. Like previous Stay Healthy Orders, violations of the May 30, 2020, Order were expressly punishable by fine, imprisonment, or both, and cities, counties, and public health districts were permitted to "enact more stringent public health orders than those set out in this [May 30, 2020] Order."

**ANSWER:** Admits the first sentence, subject to the United States' prior answers. Denies the remaining sentences as misrepresenting whether provisions of the order were mandatory.

Avers that the Order merely recommended that gatherings of 50 or more people be avoided, and again merely recommended certain hygiene protocols for such gatherings. Avers that only violation "of any mandatory provision" of the Order was punishable by fine, imprisonment, or both.

61. On June 11, 2020, IDHW issued Stay Healthy Guidelines (Stage 4). Required measures for employers remained unchanged from prior Stay Healthy Orders. Further, "gatherings" of any size were permitted, but organizers of such gatherings were to adhere to physical distancing and sanitation measures, as were also outlined by the May 16, 2020, and May 30, 2020, Orders.

**ANSWER:** Avers that all participants in gatherings (not just the organizers) were recommended (not required) to follow sanitation requirements; otherwise admits subject to the United States' prior answers.

62. Effective October 27, 2020, IDHW issued Stay Healthy Order (Stage 3). Under this Order, requirements for employers, as outlined in the May 1, 2020, May 16, 2020, and May 30, 2020, Orders, remained unchanged. Further, the October 27, 2020, Order required non-participant attendees of extracurricular activities (e.g., athletic matches and extracurricular performances) to, as in earlier Orders, maintain six-foot social distancing between individuals, implement heightened personal hygiene measures, and "regularly clean high-touch surfaces." Further, the 50-person limitation on indoor gatherings and 25% capacity limitation on outdoor gatherings applied to non- participant attendees. Like previous Stay Healthy Orders, violations of the October 27, 2020, Order were expressly punishable by fine, imprisonment, or both. Further "cities, counties, public health districts, school districts, and institutions of higher

education" were permitted to "enact more stringent public health orders than those set out in this [October 27, 2020] Order."

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

63. Effective November 14, 2020, IDHW issued Stay Healthy Order (Stage 2). Under this Order, the requirements for employers, gatherings, and extracurricular activities, as outlined in the October 27, 2020, Order, remained relatively unchanged. However, a 10-person limit on gatherings, whether indoor or outdoor, applied to non-participant attendees. Like previous Stay Healthy Orders, violations of the November 14, 2020, Order were expressly punishable by fine, imprisonment, or both. Further "cities, counties, public health districts, school districts, and institutions of higher education" were permitted to "enact more stringent public health orders than those set out in this [November 14, 2020] Order."

**ANSWER:** Admits, subject to the United States' prior answers and with the caveat that no distinction was made on "participant" versus "non-participant" attendees. Denies that "gatherings" encompassed business activity like Plaintiff's. Avers that gatherings were defined as "a planned or spontaneous event, indoors or outdoors . . . . such as a community event or gathering, concert, festival, conference, parade, wedding, or sporting event." Avers that the November 14, 2020 Order exempted "educational activities" from the definition of "gatherings." Moreover, avers that the November 14, 2020 Order expressly stated that "businesses and governmental agencies may continue operations at physical locations in the State of Idaho."

64. Effective December 30, 2020, the IDHW issued Stay Healthy Order (Stage 2). Under this Order, the requirements for employers, gatherings, and extracurricular activities, as outlined in the October 27, 2020, and November 14, 2020, Orders, remained relatively

unchanged. However, schools were not required to comply with the 10-person limitation on non-participant attendees if they "complie[d] with a plan administered and enforced by" the Idaho State Board of Education ("SBE").

**ANSWER:** The United States admits the allegations in the first sentence, but otherwise denies. Avers that the November 14, 2020 Order specifically exempted educational activity from the gathering limitations, as set forth above. Avers that the December 30, 2020 Order likewise fully exempted "educational activities" from the limitations on gatherings without any further limitation. Avers that the additional requirement of a Board of Education plan described in the third sentence was applicable *only* to the participation of non-participants in "extra-curricular activities" and did not apply to "educational activities."

65. Effective February 2, 2021, IDHW issued Stay Healthy Guidelines (Stage 3). Under this Order, requirements for employers, gatherings, and extracurricular activities remained relatively unchanged from prior orders, including the December 30, 2020, Order.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

66. Effective May 11, 2021, IDHW issued Stay Healthy Guidelines (Stage 4). Under this Order, requirements for employers and gatherings remained relatively unchanged from prior orders, including the February 2, 2021, Order. Similar to prior orders, including the December 30, 2020, and February 2, 2021, Orders, gatherings were permitted if they adhered to "Physical Distancing and Sanitation Requirements," which included six-foot social distancing; holding events outdoors, if possible; monitoring local COVID-19 infection rates "to inform planning"; and excluding sick event staff or hosts. Idaho Department of Education and State Board of Education Orders

**ANSWER:** Admits that the Stay Healthy Guidelines were issued on this date, but denies the characterization of the guidelines.

*Idaho Department of Education and State Board of Education Orders*

67. From March 23, 2020, through the end of the 2019-2020 school year, the Idaho State Board of Education ("SBE") ordered and maintained a "soft closure" of Idaho schools. This generally meant that, during this period of time, school was not conducted in-person and any on-site operations were subject to IDHW's orders that were in effect during this period.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

68. For instance, on March 23, 2020, the SBE issued COVID-19 School Operations Guidance requiring schools, including charter schools, to follow "national CDC guidelines pertaining to large gatherings and social distancing."

**ANSWER:** Admits.

69. The Idaho Department of Education also issued guidance during this period detailing how such IDHW orders were to be implemented in Idaho K-12 schools.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

70. After the soft closure that extended from March 2020 through the rest of the 2019-2020 school year, several different governmental authorities or agencies in Idaho collaborated to develop the Idaho Back to School Framework 2020 ("Reopening Framework").

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

71. Among the contributing authorities were the governor, the SBE, the Idaho Department of Education, IDHW, and Idaho's local public health districts, including Southeastern Idaho Public Health district ("SIPH").

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

72. The SBE adopted the Reopening Framework on July 9, 2020, and the measures outlined within it were applicable to Idaho K-12 schools' operations during the 2020-2021 school year.

**ANSWER:** Admits that this Reopening Framework was adopted on this date, but the United States is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

73. The Reopening Framework identified expectations, guidelines, and best practices to support local governance and the successful completion of the 2020-2021 school year, delivering on Idaho's constitutional obligation for a free, uniform, and thorough public education system.

**ANSWER:** Admits that this is how the reopening framework characterized itself.

74. The Reopening Framework outlined measures that schools were required to take to minimize the risk of COVID-19 transmission and keep all individuals on the campus, including students, teachers, and staff, safe.

**ANSWER:** Denies that these measures were required (as the Reopening Framework stated that "[t]he areas identified in the table below are not mandated responses; rather they are a compilation of suggested areas of consideration and best practices") but otherwise admits.

75. The Reopening Framework mandated that "school districts and charter schools will use this framework to help guide their response based on their local community's situation." Specifically, guidance within the Reopening Framework was governed by the level of transmission/risk in the community—Categories 1, 2, and 3, with Category 1 being the lowest risk category and requiring the least restrictive measures, and Category 3 being the highest risk category and requiring the most restrictive measures.

**ANSWER:** Denies that this was mandated and avers that there were four categories, not three, but otherwise admits.

76. Under Category 1 transmission/risk conditions, schools were required to:

a. Coordinate with local health officials to develop prevention and mitigations plans;

b. Implement a reasonable and feasible infection control plan for a safe workplace;

c. Clean/disinfect frequently touched surfaces at least daily and shared objects after each use;

d. Conduct deep cleaning of schools prior to students/staff returning; schedule periodic cleanings during weekends or school holidays/breaks (to the extent practicable);

e. Provide adequate supplies for more frequent and heightened personal hygiene;

f. Prepare to address all families' and students' needs if a transition to hybrid/blended or remote is required;

g. Conduct cleaning of cafeterias and high-touch surfaces throughout the school day;

h. Determine capacity for production and service of student meals;

i. Determine maximum number of people per room/gathering, and spacing;

j. Evaluate school food service preparation facilities and structures for availability to continue operations;

k. Limit field trips to areas with no community transmission;

l. Clean and disinfect frequently touched surfaces on the bus at least daily;

m. Space students by family groups on buses; and

n. Air out and deep clean buses when not in use.

**ANSWER:** Denies that they were "required," but otherwise admits that these items were recommended in the Reopening Framework.

77. Under Category 2[4] transmission/risk conditions, schools were required to:

a. Conduct daily health screenings of employees and students for COVID-19 symptoms upon entry to the facility;

b. Isolate and send home students and staff that show symptoms;[5]

c. Establish a protocol for screening visitors and volunteers;

[4] The Framework specified that an individual category's measures included those of a preceding category. So, Category 1 measures are incorporated into Category 2 measures, and Categories 1 and 2 measures incorporated into Category 3.

**ANSWER:** Admits.

[5] The Framework here directed schools to CDC guidelines.

**ANSWER:** Admits.

d. Close off areas used by a sick person and do not use before cleaning and disinfection. Wait 24 hours before you clean or disinfect if possible. If it is not possible to wait 24 hours, wait as long as possible. Ensure safe and correct application of disinfectants;

e. Implement physical distancing and remote/blended learning as determined by the local school Board/ Board of Directors, including:

   i. Use the master schedule to balance class numbers as much as possible – remove unused desks and furniture in classrooms; maximize social distancing (to the extent practicable);

   ii. Limit physical interaction through partner or group work;

   iii. Establish distance between the teacher's desk/board and students' desks;

   iv. Identify and utilize large spaces (e.g. gymnasiums, auditoriums, outside spaces – as weather permits) for social distancing;

   v. Consider targeted distance/remote learning;

   vi. Consider A/B schedules (i.e., students attend half of their classes on "A"days and the other half on "B" days);

   vii. Consider hybrid instructional Models if absolutely necessary and after factoring in additional logistical requirements/costs including childcare requirements placed on working families and unnecessary burden on staff;

viii. Consider allowing special education students to continue in-person instruction as these students often rely on daily routines and social interactions to address their individual learning needs;

ix. Variety of effective communication to provide support for parents and students especially in the remote areas such as using Spanish radio, social media platforms, group texting, etc.; and

x. Distribute printed instructional packets/materials and district/school communications along with meals; designate and communicate collection/drop off points;

f. Use disposable plates, utensils, etc. if applicable and practical;

g. Conduct cleaning of cafeterias and high-touch surfaces throughout the school day;

h. Implement an alternative serving model, including serving meals in classrooms or serving meals in cafeteria with social distancing and staggered meal periods;

i. Avoid sharing of foods and utensils;

j. Screen students and bus drivers for symptoms of illness and utilize spaced seating (to the extent practicable);

k. Eliminate field trips;

l. Clean and disinfect frequently touched surfaces on the bus at least daily;

m. Establish protocols for bus stops, loading/unloading of children from different households; and

n. Confer with CDC Guidance titled "What Bus Operators Need to Know".

**ANSWER:** Denies that they were "required," but otherwise admits that these items were in the Reopening Framework.

78. Under Category 3 transmission/risk conditions, schools were required to:

a. Continue coordination with local health officials;

b. Make considerations for family support for packets being sent home or online instructions for economically disadvantaged and English language learner student families. Provide resources and instruction on how to use platforms and navigate software. Use of bilingual instructional paraprofessionals to work with family and students on packets or navigating the online program;

c. Provide professional development opportunities for parents, students, and teachers regarding mental health illness and support;

d. Practice established social distancing protocols to the greatest extent practicable;

e. Reduce contact by delivering a week's worth of meals during a designated time;

f. Suggest using transportation for meals to deliver to students while school is closed;

g. Limit transportation of small groups of students from same family that need to come to school facilities to receive services;

h. Sanitize buses between groups of students; and

i. Schedule delivery/pick-up in ways that reduce contact to the number of students and families.

**ANSWER:** Denies that they were "required," but otherwise admits that these items were in the Reopening Framework.

79. The Framework also outlined telework measures for teachers and staff; required development of a contact tracing protocol for when students or staff in the building tested positive; and provide heighted supports and interventions for all students, including special education students, those requiring accommodations pursuant to a 504 plan, and English language learners.

**ANSWER:** Denies that they were "required," but otherwise admits that these items were in the Reopening Framework.

2. *Regional or Local Governmental Orders*

*Southeastern Idaho Public Health District*

80. Southeastern Idaho Public Health District ("SIPH") is the governing public health district for Bannock County, which is where Plaintiff's facility is located and Plaintiff operates.

**ANSWER:** Admits.

81. Effective July 24, 2020, SIPH issued its COVID-19 Regional Response Plan ("Response Plan"), which was developed by SIPH as Idaho initially transitioned from a state-level response to a more targeted regional response.

**ANSWER:** Admits that the plan was issued on the listed date, but the United States is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

82. The Response Plan established four risk level categories, which outlined recommended mitigation strategies according to infection rate in the community: Green (Minimal Risk); Yellow (Moderate Risk); Orange (High Risk); and Red (Critical Risk).

**ANSWER:** Admits.

83. The Response Plan provided that "schools should implement strategies in response to these guidelines and those of Idaho Back to School Framework 2020" at all risk levels.

**ANSWER:** Admits but avers that the language "and those of Idaho Back to School Framework 2020" was not included in the Critical Risk category.

84. SIPH monitored community infection rates during the third and fourth quarters of 2020 and the first, second, and third quarters of 2021, and assigned risk levels on a per-county basis according to infection rate.

**ANSWER:** Admits that the plan has metrics for infection rates, but the United States is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

85. As relevant here, SIPH determined that Bannock County was at the Orange level from at least November 5, 2020, through at least January 15, 2021; at the Yellow level from at least January 29, 2021, through February 26, 2021; and at Green level from at least March 15, 2021, through July 16, 2021.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

86. However, as acknowledged by SIPH, the available risk level categories were outdated as of July 1, 2021, and did not reflect the "dramatic resurgence" of COVID-19 infection rates in Idaho counties. In fact, Bannock County was again in the highest CDC risk level as of August 19, 2021.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

*3. Federal Government Orders*

87. Plaintiff was also subject to orders issued by federal agencies, including the Centers for Disease Control and Prevention ("CDC"), the U.S. Department of Education ("DE"), and the Occupational Safety and Health Administration ("OSHA").

**ANSWER:** The United States admits that the CDC, DE, and OSHA issued orders and guidance, but otherwise is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

*U.S. Centers for Disease Control and Prevention*

88. Throughout the tax periods at issue, the CDC issued assorted guidance that outlined measures that K-12 schools could use to protect the health of safety of its students, teachers, staff, and administrators and slow the spread of COVID-19.

**ANSWER:** Admits.

89. The guidance was updated continuously to align with updated knowledge and understanding of the virus and science.

**ANSWER:** Admits.

90. For example, by January 1, 2021, the CDC's mitigation strategies for schools included:

a. Reviewing, updating, and implementing emergency operations plans that incorporate, amongst other things, monitoring local COVID-19 data in the local community; developing systems to share relevant information with stakeholders; adopting mitigation strategies to promote healthy behaviors;

and establishing criteria (in consultation with local officials) for when a school will suspend in-person learning;

b. Requiring students and staff to stay home when sick or exposed to COVID-19;

c. Increasing monitoring of students and staff "to ensure adherence" with 20-second handwashing with soap and water;

d. Teaching and reinforcing masking by students and staff;

e. Ensuring adequate supplies for personal hygiene by students and staff, including soap, a way to dry hands, tissues, 60%-alcohol hand sanitizer, disinfectant wipes, masks, and no-touch/foot-pedal cans;

f. Posting signs that promote everyday protective measures and describe how to stop the spread of COVID-19;

g. Developing a schedule for increased daily routine cleaning and disinfection, including frequently touched surfaces and school buses;

h. Discouraging the sharing or items and minimizing sharing of high touch materials;

i. Upgrading ventilation and circulating air more often;

j. Modifying the layouts of classrooms and other areas to maximize physical distancing;

k. Installing physical barriers and providing physical guides for traffic control;

l. Closing communal spaces and having students eat outdoors or in classrooms (as feasible);

m. Implementing operational changes to the school day, including cohorting students, alternating and staggering the school schedule, limiting gatherings (including sporting events), visitors, and field trips, and limiting nonessential travel;

n. Designating a COVID-19 point of contact;

o. Cross-training staff and implementing flexible sick leave policies and practices for when staff must stay home; and

p. Planning and implementing general measures for when someone was or became sick with COVID-19 while at schools, including making sure staff and students stay home, isolating sick individuals until they can go home, cleaning and disinfecting areas where infected individuals were, and mandatory reporting.[6]

**ANSWER:** Denies that these strategies were required or mandated but otherwise admits.

91. In February 2021, the CDC issued further guidance that reinforced strategies outlined above. For example, the guidance emphasized that "it is critical that schools use and layer mitigation strategies" and identified and promoted five key, essential mitigation strategies :

a. Universal and correct use of masks;

b. Physical distancing (of at least six feet), implemented through various strategies such as cohorting students, staggering the school schedule,

---

[6] *Id.*

alternating schedules, limiting nonessential visitors, and installing physical barriers;

c. Handwashing and respiratory etiquette;

d. Cleaning and maintain healthy facilities; and

e. Contact tracing in combination with isolation and quarantine.

**ANSWER:** Denies that these strategies were required or mandated but otherwise admits.

92. On March 21, 2020, the CDC also outlined measures all employers should take to ensure the health and safety of their employees, which complemented the school-specific measures, including:

a. Requiring actively or potentially sick employees to self-quarantine;
b. Screening employees at the workplace for COVID;
c. Providing face coverings and sanitizing materials;
d. Implementing and enforcing social distancing policies/protocols to minimize close contacts, including implementing flexible worksites and work hours; and altering physical workspaces to maximize distance between employees;
e. Canceling, adjusting, or postponing large work-related meetings or gatherings that can only occur in-person;
f. Performing routine and enhanced cleaning and sanitizing of high-touch surfaces;
g. Implementing flexible sick leave and supportive policies and practices; and

h. Educating and training their employees about COVID-19 best practices.

**ANSWER:** Denies that these measures were required or mandated but otherwise admits.

93. The CDC updated their strategies for employers in May 2020, including implementing daily health checks, wearing cloth face masks in the workplace, implementing policies/practices for social distancing in the workplace, and improving ventilation.

**ANSWER:** Denies that these strategies were required or mandated but otherwise admits.

94. The CDC guidance also directed employers to OSHA guidance that reinforced CDC measures and that was tailored according to the risk of transmission in specific workplaces.

**ANSWER**: Denies that these measures were required or mandated but otherwise admits.

95. The business and employer guidance was continuously expanded and updated throughout 2020 and the first three quarters of 2021.

**ANSWER:** Admits.

*U.S. Department of Education*

96. The U.S. Department of Education ("DE") issued COVID-19 guidance specific to schools' operations in February 2021 to "aid educators in implementing the [CDC's] Operational Strategy for K-12 Schools through Phased Mitigation (K-12 Operational Strategy) by addressing common challenges and providing practical examples."

**ANSWER:** Denies that this guidance was required or mandated but otherwise admits.

97. That guidance emphasized similar measures from the CDC guidance, accordingly, including universal and correct use of masks; implementing strategies to maximize social distancing of at least six feet between individuals in school; cohorting students; adopting protocols in school buses to maximize physical distancing; requiring students and staff to quarantine or isolate if exposed to COVID-19; teaching and enforcing handwashing and

respiratory etiquette; and prioritizing in-person learning over in-person extracurricular activities and athletic programs.

**ANSWER:** Denies that these measures were required or mandated but otherwise admits.

98. The DE's guidance was updated and in effect throughout the first, second, and third quarters of 2021.

**ANSWER:** Denies that this guidance was required or mandated but otherwise admits.

*U.S. Occupational Safety and Health Administration*

99. Throughout the COVID-19 pandemic, the U.S. Occupational Safety and Health Administration ("OSHA") required employers to follow guidance from CDC, OSHA, and local authorities.

**ANSWER:** The United States admits that OSHA issued guidance during the COVID-19 pandemic, but otherwise is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

100. From early in 2020, OSHA recognized the risk of exposure to COVID-19 in all work settings. In April of 2020, OSHA issued guidelines that required employers to create strict protocols to prevent the spread of COVID-19.

**ANSWER:** The United States admits the first sentence and that OSHA issued workplace guidance in April of 2020, but is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence, and therefore denies them.

101. In January 2021, OSHA also issued standards that reinforced CDC protocols.[7] This mandatory guidance outlined COVID-19-specific measures to be implemented in all workplaces. Employers were warned of OSHA inspections focused on areas experiencing elevated levels of COVID-19 transmission. These inspections were "to ensure safe and healthy conditions" were being met for employees.

**ANSWER:** The United States admits the first sentence, and denies the second sentence as the guidance was not mandatory. The United States is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in the third and fourth sentences of this paragraph, and therefore denies them.

102. Additionally, these mandatory guidelines reiterated other OSHA standards applicable to addressing COVID-19 in the workplace, citing Federal law and regulations as support.

**ANSWER:** The United States admits that the guidelines reiterated other OSHA standards, and cited federal law and regulations, but denies that the guidelines were mandatory.

---

[7] OSHA originally released guidelines, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace*, with the assistance of the CDC, on January 29, 2021, with updates on June 10, 2021, and August 13, 2021. These mandatory OSHA standards were issued to "assist employers in providing a safe and healthful workplace." These guidelines included sending those exposed to COVID-19 home, implementing social distancing policies, providing adequate COVID-19 training to employees, mandatory reporting, and increasing the frequency and intensity of cleaning and disinfecting. This mandatory guidance is still active on the OSHA website today. *See id.*, https://www.osha.gov/coronavirus/safework (last visited May 21, 2025).

**ANSWER:** Admits that the guidelines referenced were issued and updated on the dates referenced, but deny that these were mandatory guidance or standards.

**C. Plaintiff's Business Operations Were Impacted by Government Orders**

103. Government orders discussed above prevented, restricted, or substantially limited conduct of Plaintiff's activities and thereby caused a full or partial suspension of Plaintiff's business operations during the quarters at issue.

**ANSWER:** Denies.

104. Specifically, Plaintiff implemented a hybrid instructional model in which half of its students attended school in person on only Mondays and Thursdays while the other half attended school in person on Tuesdays and Fridays ("hybrid model"). Under the hybrid model, Wednesdays were used for teacher planning days and were also days on which teacher met with students virtually on a one-on-one basis.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

105. Further, each time Plaintiff learned of a student or staff member becoming infected by COVID-19 infection, students and staff who had been in contact with the infected person were quarantined and were not able to attend school ("quarantining"). This meant that Plaintiff attempted to provide educational services to those students 100 percent virtually for between 5 and 10 days. Attendance rates for students in the virtual environment were very poor and, in several instances, resulted in an entire class being absent from school. At one point in time, more than half of Plaintiff's school was quarantined, causing Plaintiff to suspend in-person teaching for the remainder of that school week.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

106. The hybrid program and quarantining protocols during the quarters at issue reduced in- person teaching significantly and caused learning growth and academic progress to be far lower than in a typical school year.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

107. Also, Plaintiff repurposed its gymnasium for use by students who did not have support for at-home or virtual learning. Specifically, Plaintiff purchased and placed tables and chairs in its gymnasium. Two students were seated at opposite ends of each table, and Plaintiff hired Educational Assistants who provided support to students that was similar to how parents were expected to support their at-home students. This resulted in the gymnasium being unavailable for physical education class or other school functions that would typically occur there.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

108. Plaintiff also diverted economic resources to pay a 30 hour-per-week employee to clean and disinfect the school and an additional 10 hour-per week-employee to work in the library sanitizing books for student use.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

109. Also, students were not permitted to use the designated room for lunches. Rather, students were required to eat lunches in their classrooms. This diverted teachers' work from preparing and delivering educational instruction to their students to supervising students during lunch and doing post-lunch cleanup of their classrooms.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

110. Further, teachers were required to disinfect their classrooms throughout the day, which also diverted teachers' work from preparing and delivering educational instruction to their students.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

111. Plaintiff staggered admission and release times to limit number of bodies in the hallway, further reducing the amount of time that Plaintiff's teachers were able to deliver educational instruction to their students.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

112. Plaintiff's teachers and its administrator were unable to attend the annual National EL Education conference, which enhances the education Plaintiff provided to its students by providing professional development for Plaintiff's teachers.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

113. Plaintiff was not able to hold its usual Annual Speech Festival. The Speech Festival was an annual competitive event where all students grades kindergarten through eighth prepared and recited speeches to a live audience of peers and judges.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

114. As a result of the conditions described above, Plaintiff's business operations were fully or partially suspended due to orders from governmental authorities during the quarters at issue.

**ANSWER:** Denies.

115. More than six months have passed since Plaintiff filed its ERC Refund Claims.

**ANSWER:** Admits that more than six months have passed since Plaintiff filed the Forms 843 at issue.

116. The IRS has not issued ERC Refunds for the quarters at issue nor has it disallowed the ERC Refund Claims.

**ANSWER:** Denies.

**COUNT ONE: QUARTER TWO OF 2020**

117. Plaintiff incorporates by reference paragraphs 1 through 116.

**ANSWER:** The United States incorporates by references if responses to these paragraphs.

118. On or about April 18, 2025, Plaintiff filed a Form 843, *Claim for Refund and Request for Abatement*, with the IRS for the second quarter of 2020 ("Q2 2020 Form 843") making a payment in the amount of $3,540.00 representing the full amount of the ERC to which Plaintiff was eligible for one particular employee for the second quarter of 2020. The Q2 Form 843 claimed a refund in the amount of $3,540.00.

**ANSWER:** The United States admits that this form was filed on or about this date, and that such payment was made and such refund requested, but otherwise denies.

119. Plaintiff paid wages and compensation to the employee with respect to which it made the employment tax payment and filed the claim refund described in paragraph 118.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

120. Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during the second quarter of 2020, within the meaning of the I.R.C. § 3134.

**ANSWER:** Denies.

121. Based on the foregoing, Plaintiff is entitled to a refund of $3,540.00 for the second quarter of 2020.

**ANSWER:** Denies.

## COUNT TWO: QUARTER THREE OF 2020

122. Plaintiff incorporates by reference paragraphs 1 through 121.

**ANSWER:** The United States incorporates its responses to those paragraphs.

123. On or about April 18, 2025, Plaintiff filed a Form 843, *Claim for Refund and Request for Abatement*, with the IRS for the third quarter of 2020 ("Q3 2020 Form 843") making a payment in the amount of $1,350.00 representing the full amount of the ERC to which Plaintiff was eligible for one particular employee for the third quarter of 2020. The Q3 2020 Form 843 claimed a refund in the amount of $1,350.00.

**ANSWER:** The United States admits that this form was filed on or about this date, and that such payment was made and such refund requested, but otherwise denies.

124. Plaintiff paid wages and compensation to the employee with respect to which it made the employment tax payment and filed the claim refund described in paragraph 123.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

125. Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during the third quarter of 2020 within the meaning of the I.R.C. § 3134.

**ANSWER:** Denies.

126. Based on the foregoing, Plaintiff is entitled to a refund of $1,350.00 for the third quarter of 2020.

**ANSWER:** Denies.

**COUNT THREE: QUARTER FOUR OF 2020**

127. Plaintiff incorporates by reference paragraphs 1 through 126.

**ANSWER:** The United States incorporates its responses to those paragraphs.

128. On or about April 18, 2025, Plaintiff filed a Form 843, *Claim for Refund and Request for Abatement*, with the IRS for the fourth quarter of 2020 ("Q4 2020 Form 843") making a payment in the amount of $110 representing the full amount of the ERC to which Plaintiff was eligible for one employee for the fourth quarter of 2020. The Q4 2020 Form 843 claimed a refund in the amount of $110.

**ANSWER:** The United States admits that this form was filed on or about this date, and that such payment was made and such refund requested, but otherwise denies.

129. Plaintiff paid wages and compensation to the employee with respect to which it made the employment tax payment and filed the claim refund described in paragraph 128.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

130. Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during the fourth quarter of 2020 within the meaning of

the I.R.C. § 3134.

**ANSWER:** Denies.

131. Based on the foregoing, Plaintiff is entitled to a refund of $110 for the fourth quarter of 2020.

**ANSWER:** Denies.

**COUNT FOUR: QUARTER THREE OF 2021**

132. Plaintiff incorporates by reference paragraphs 1 through 131.

**ANSWER:** The United States incorporates its responses to those paragraphs.

133. On or about April 18, 2025, Plaintiff filed a Form 843, *Claim for Refund and Request for Abatement*, with the IRS for the third quarter of 2021 ("Q3 2021 Form 843") making a payment in the amount of $7,000 representing the full amount of the ERC to which Plaintiff was eligible for one employee for the third quarter of 2021. The Q3 2021 Form 843 claimed a refund in the amount of $7,000.

**ANSWER:** The United States admits that this form was filed on or about this date, and that such payment was made and such refund requested, but otherwise denies.

134. Plaintiff paid wages and compensation to the employee with respect to which it made the employment tax payment and filed the claim refund described in paragraph 133.

**ANSWER:** The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

135. Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during the third quarter of 2021 within the meaning of the I.R.C. § 3134.

**ANSWER:** Denies.

136. Based on the foregoing, Plaintiff is entitled to a refund of $7,000 for the third quarter of 2021.

**ANSWER:** Denies.

## JURY DEMAND

137. Plaintiff demands a jury trial on all issues so triable.

**ANSWER:** This is not an allegation requiring a response.

## DEFENSES

1. Should the Court determine that Plaintiff raised a meritorious argument that would otherwise establish that Plaintiff overpaid its taxes, the United States is entitled to reduce that overpayment based on any additional tax liabilities that the Plaintiff may owe, whether or not previously assessed or alleged. The United States is entitled to such reduction because the redetermination of the Plaintiff's entire liability for the applicable tax periods is at issue in this refund suit. 26 U.S.C. § 6402(a); *Lewis v. Reynolds*, 284 U.S. 281 (1932); *R.H. Donnelley Corp. v. United States*. 641 F.3d 70 (4th Cir. 2011).

2. The Court lacks jurisdiction over this action to the extent that the Forms 843 at issue do not constitute proper administrative claims for refund. 26 U.S.C. § 7422(a). ("No suit or proceeding shall be maintained… until a claim for refund or credit has been duly filed with the Secretary."); 26 C.F.R. § 31.6402(a)-1(a)(1)(ii) ("The claim for credit or refund must be filed on the form prescribed by the IRS…"); 26 C.F.R. § 301.6402-3(a)(4) ("In the case of an overpayment of income taxes . . . a claim for credit or refund shall be made on the appropriate amended income tax return."). On the first page, the Instructions for Form 843 (Rev. December 2024), specifically caution: "Employers cannot use Form 843 to request a refund or an abatement

of Federal Insurance Contributions Act (FICA) tax, Railroad Retirement Tax Act (RRTA) tax or income tax withholding."

WHEREFORE, the United States prays for judgment in its favor and against Plaintiff as follows:

A. That the Court deny the relief requested in the Complaint; and

B. That the United States be awarded its costs and any other relief the Court deems just and proper.

# UNITED STATES' COUNTERCLAIM AGAINST PLAINTIFF

## INTRODUCTION

1. The United States brings this counterclaim to reduce federal employment tax liabilities to judgment that stem from the federal employment tax assessments the IRS made against Pocatello Community Charter School (PCCS), the Plaintiff and Counterclaim Defendant in this case.

2. This counterclaim is brought pursuant to 26 U.S.C. § 7401 with the authorization and at the request of the Secretary of the Treasury of the United States, acting through the Secretary's delegate, the Associate Area Counsel of the IRS. The United States files this counterclaim at the direction of the Attorney General of the United States.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this counterclaim under 28 U.S.C. § 1340, 28 U.S.C. § 1346(c), and 26 U.S.C. § 7402.

4. Venue is proper in the District of Idaho under 28 U.S.C. § 1391(d) and 28 U.S.C. § 1396 because PCCS's principal place of business is in this District.

**TAX LIABILITIES AT ISSUE**

5. PCCS is a school-of-choice based on a charter, serving students from kindergarten through the eighth grade in Pocatello, Idaho.

6. PCCS timely filed Forms 941 (Employer's Quarterly Federal Tax Return) reporting taxes due for the tax quarters ended June 30, 2020, September 30, 2020, December 31, 2020, and September 30, 2021 ("quarters at issue").

7. On or about July 18, 2022, PCCS timely filed amended Forms 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund) for the quarters at issue, claiming refunds based on claims to Employee Retention Credits.

8. The IRS issued refunds to PCCS of $160,886.74 for the quarter ended June 30, 2020, $30,559.31 for the quarter ended September 30, 2020, $57,494.08 for the quarter ending December 31, 2020, and $196,391.92 for the quarter ending September 30, 2021, based on PCCS's claim to Employee Retention Credits.

9. After examining the question of PCCS's entitlement to the Employment Retention Credits for all periods, including the quarters at issue, the IRS properly determined that PCCS was not entitled to Employee Retention Credits for any tax period because PCCS was not "fully or partially suspended during the calendar quarter[s] due to orders from an appropriate governmental authority…" 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

10. As such, pursuant to 26 U.S.C. § 6201 and 26 C.F.R. §§ 301.6201-1 and/or 31.31341, the IRS assessed against PCCS tax and interest in the total amount of $160,886.74 for the quarter ended June 30, 2020, $30,559.31 for the quarter ended September 30, 2020, $57,494.08 for the

quarter ending December 31, 2020, and $196,391.92 for the quarter ending September 30, 2021. The IRS also assessed additional interest and penalties for late payment of tax for these quarters.

11. By Notices CP220 dated June 5, 2023 (June 30, 2020 quarter), March 11, 2024 (September 30, 2020 and December 31, 2020 quarters), and July 1, 2024 (September 30, 2021 quarter) the IRS notified Plaintiff that it had made the assessments described in the paragraphs above, and made demands for payment of the balances due.

12. As of March 12, 2026, $228,962.33 remains due for the June 30, 2020 quarter, $40,899.00 for the September 30, 2020 quarter, $80,154.58 for the December 31, 2020 quarter, and $262,640.12 for the September 31, 2021 quarter, plus statutory interest and other additions to tax provided by law that will continue to accrue from that date until paid in full.

## CLAIM FOR RELIEF: Reduce Federal Tax Liabilities to Judgment

13. Despite timely notice and demand for payment of the assessments described above, PCCS has failed or refused to pay the assessed amounts, interest, and other statutory additions that have accrued on the assessments.

14. The United States is entitled to judgment against PCCS in the total amount of $612,656.03 for unpaid federal employment taxes for the quarters at issue, plus statutory interest and other additions to tax as provided by law that will continue to accrue until paid in full.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that the Court grant the following relief:

A. Enter judgment in favor of the United States and against PCCS on the assessments for unpaid federal employment taxes for the quarters at issue in the total amount of $612,656.03,

plus interest and other statutory additions accruing thereon as provided by law, minus any payments and credits.

B. Grant the United States its costs in this action and such other and further relief as the Court deems just and proper.

Respectfully submitted this 27th day of April, 2026.

*\/s/ Landon M. Yost*
LANDON M. YOST
Trial Attorney, Tax Division
U.S. Department of Justice

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing has been made this 27th day of April, 2026, via the Court's CM/ECF system to Plaintiff's counsel.

/s/ Landon M. Yost
LANDON M. YOST
Tax Division
U.S. Department of Justice